## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SUSAN L. POOLE, JOHN DOE 1, THOMAS AND SUE CLATTERBUCK, JOSEPH S. AND BRENDA S. COCHRAN, JOHN AND JANE DOE 2, JOHN DOE 3, JOHN DOE 4, CHARLES C. MANNER, DENNIS H. OWENS, JOHN DOE 5, JOHN DOE 6, BRENT ROGERS, JOHN AND JANE DOE 7, ROBERT SHAW, and NEW YORK ANIMAL AND FARM, LLC, <br>     *Plaintiffs,* <br><br>     v. <br><br> BRIAN BENDIXEN, AMBER BROWN, KAREN CARTIER, EARL DEHMEY, JAMES KELLEHER, SHARAD MATHUR, ALEX BACHELOR, MARTIN BATES, ALAN BERNON, ANDREW BRUMMEL, KRISTEN COADY, DAVID DARR, DOUG GLADE, KEITH GOMES, BRAD KEATING, JACKIE KLIPPENSTEIN, MONICA MASSEY, RANDY MCGINNIS, PAT PANKO, DENNIS RODENBAUGH, RICK SMITH, KEVIN STRATHMAN, EDWARD TILLEY, JAY WALDVOGEL, GREG WICKHAM, JOHN WILSON, LARRY BAILEY, BRUCE BARTLEY, WILLIAM BESANCON, PATRICIA BIKOWSKY, KENNETH BIRKER, KEITH BROUMLEY, GLEN EASTER, CRAIG ELDER, TRAVIS FOGLER, ALAN GERRATT, GREGORY GIBSON, BUSTER GOFF, LARRY GRIFFITH, LARRY HANCOCK, DEAN HANDY, BRIAN HARDY, TODD HATHORN, JERREL HEATWOLE, KENT HERMAN, NEIL HOFF, GARRY KIBLER, CHRIS KRAFT, LILAH KREBS, SCOTT LACKEY, BYRON LEHMAN, MELVIN MEDEIROS, RANDY MOONEY, LARKIN MOYER, DWIGHT NASH, DOUG NUTTELMAN, THOMAS OELRICHS, PETER OLSEN, LEROY ORNELLAS, JACQUES PARENT, VALERIE PATTEN, RICK PODTBURG, JEFF RANEY, BRIAN REXING, TERRY ROWLETT, DAN SENESTRARO, RON SHELTON, LARRY SHOVER, JERRY SPENCER, SANDY STAUFFER, STEVE STRICKLER, PERRY TJAARDA, CASE VAN STEYN, DAVID WHITE, and JOHN WOEBLER, <br>     *Defendants.* | Case No.  6:20-CV-697[GTS/ATB] |

**COMPLAINT AND JURY DEMAND**

By means unfitting a law-abiding corporation, let alone a farmers' cooperative organized for member benefit, Defendants have been operating a milk cartel which has shattered our nation's crucial dairy industry. Prior to the coronavirus pandemic, this cartel had much of the U.S. dairy industry facing full-scale collapse with record farm failures and rural communities drained of economic activity.

At this critical moment for public nutrition, the dairy supply chain created by the Defendants' illegal conduct is failing both the farmers and the consumers. Grocery shelves are empty, farm milk is being dumped into fields and manure pits, dairy products are rationed, and producer pay prices are crashing even as consumer prices soar. During the height of the pandemic, this collapse spread from Main Street, Rural America to Wall Street, New York City as Defendants extorted substantially all assets from the nation's largest milk processor after forcing its bankruptcy.

Defendants' solution to the failed U.S. milk system presents the ultimate extortion: either the federal government subsidizes the production and sale of the cartel's product, or the cartel oversees the collapse of the centralized U.S. consumer dairy supply chain.

Accordingly, the above Plaintiffs file this Complaint and Jury Demand under the Racketeer-Influenced and Corrupt Organizations Act requiring divestiture and dissolution together with all damages available under law. Plaintiffs allege as follows.

**PLAINTIFFS**

1.  Plaintiff Susan L. Poole was at all relevant times a shareholder of Dean Foods Company whose investment in U.S. dairy was destroyed by Defendants' racketeering set forth herein.

2.  Plaintiffs John Doe 1, Thomas and Sue Clatterbuck, Joseph S. and Brenda S.
    Cochran, John and Jane Doe 2, John Doe 3, John Doe 4, Charles C. Manner, Dennis
    H. Owens, John Doe 5, John Doe 6, Brent Rogers, John and Jane Doe 7, and Robert
    Shaw ("Plaintiff Dairy Farmers") are U.S. dairy farmers whose milk income has been
    reduced or eliminated by Defendants' racketeering set forth herein. Doe plaintiffs are
    attempting to continue dairy farming, and accordingly request anonymity to avoid
    retaliation by Defendants.

3.  Plaintiff New York Animal and Farm, LLC is a dairy supply business whose revenue
    stream has been injured by Defendants' racketeering set forth herein.

## DEFENDANTS

4.  Dairy Farmers of America, Inc. agents Brian Bendixen, Amber Brown, Karen Cartier,
    Earl Dehmey, James Kelleher, and Sharad Mathur jointly and severally performed
    the pattern of racketeering activity set forth herein.

5.  Dairy Farmers of America, Inc. managers Alex Bachelor, Martin Bates, Alan Bernon,
    Andrew Brummel, Kristen Coady, David Darr, Doug Glade, Keith Gomes, Brad
    Keating, Jackie Klippenstein, Monica Massey, Randy McGinnis, Pat Panko, Dennis
    Rodenbaugh, Rick Smith, Kevin Strathman, Edward Tilley, Jay Waldvogel, Greg
    Wickham, and John Wilson jointly and severally directed and performed the pattern
    of racketeering activity set forth herein.

6.  Dairy Farmers of America, Inc. board members Larry Bailey, Bruce Bartley, William
    Besancon, Patricia Bikowsky, Kenneth Birker, Keith Broumley, Glen Easter, Craig
    Elder, Travis Fogler, Alan Gerratt, Gregory Gibson, Buster Goff, Larry Griffith, Larry
    Hancock, Dean Handy, Brian Hardy, Todd Hathorn, Jerrel Heatwole, Kent Herman,
    Neil Hoff, Garry Kibler, Chris Kraft, Lilah Krebs, Scott Lackey, Byron Lehman,

Melvin Medeiros, Randy Mooney, Larkin Moyer, Dwight Nash, Doug Nuttelman, Thomas Oelrichs, Peter Olsen, Leroy Ornellas, Jacques Parent, Valerie Patten, Rick Podtburg, Jeff Raney, Brian Rexing, Terry Rowlett, Dan Senestraro, Ron Shelton, Larry Shover, Jerry Spencer, Sandy Stauffer, Steve Strickler, Perry Tjaarda, Case Van Steyn, David White, and John Woebler jointly and severally aided and abetted the pattern of racketeering activity set forth herein.

## STATEMENT OF JURISDICTION

7. This Court has subject matter jurisdiction over the Plaintiffs' claims under 28 U.S.C. 1331 and 18 U.S.C. 1964 because these claims arise under the laws of the United States protecting trade and commerce against racketeering.

8. This Court has personal jurisdiction over the Defendants because the Defendants purposefully and continuously conduct substantial business within the United States and within this District.

9. Joinder is proper because the Plaintiffs' claims arise out of the same series of transactions or occurrences and the action involves questions of law and fact common to all plaintiffs.

10. Venue is proper in this District under and 28 U.S.C. 1391 because Defendants reside or transact substantial business herein.

11. Defendants' activities which give rise to this Complaint are within the stream of and substantially affect interstate commerce in a commodity in which there is a substantial public interest.

**THE ENTERPRISE:**

**"DAIRY FARMERS OF AMERICA"**

12. In 1977, the Department of Justice entered a consent decree dissolving Mid-America Dairymen on antitrust grounds. However, the members reorganized (with former Mid-America Dairymen CEO Gary Hanman as CEO) into Dairy Farmers of America, Inc. ("DFA") formed in 1998.

13. Dairy Farmers of America was at all relevant times the nation's largest dairy cooperative by both membership and milk volume. Today, DFA has approximately 14,000 members, which represents nearly half of all U.S. dairy producers. As an agricultural cooperative, it is required by law to operate solely for the benefit of these members. DFA's members produce over 30% of U.S. milk.

14. By comparison, the runner-up by membership, Associated Milk Producers, has approximately 2,000 members, and the runner-up by volume, California Dairies, produces approximately 8% of U.S. milk.

15. In addition to marketing members' milk to dairy processors, DFA owns and operates 42 dairy plants nationwide which produce products under DFA-owned brands. DFA owns an additional 44 processing plants and related brands from the bankruptcy estate of Dean Foods Company, together with the largest direct-to-store distribution network in the nation. Locally, DFA is the primary or exclusive source for milk sold under the Garelick, Crowley, Byrne Dairy, and Hood brands.

16. In New York, DFA's Farmer Services control the majority of available livestock auctions in the state, even those of farmers who are not DFA members.

17. Nationwide, DFA Farmer Services range from testing farmers' milk, feed, soil, and water, sourcing energy, and supplying milking equipment to selling farm insurance and holding farm operating loans and other debt.

18. Through National Milk Producers Federation (NMPF), Defendants control the dairy policies affecting U.S. dairy farmers regardless of whether such farmers are DFA members.

19. NMPF's membership comprises substantially all U.S. dairy cooperatives and includes Dairy Farmers of America as well as regional cooperatives Agri-Mark (850 farms), Associated Milk Producers (2,000 farms), California Dairies (400 farms), Cayuga Milk (30 farms), Ellsworth Cooperative Creamery (450 farms), Foremost Farms (1,000 farms), Land O'Lakes (1,850 farms), Lone Star Milk Producers (120 farms), Maryland & Virginia Milk Producers (930 farms), Michigan Milk Producers Association (1,300 farms), DFA member cooperative Mount Joy (316 farms), Prairie Farms (900 farms), Southeast Milk (140 farms), and United Dairymen of Arizona (69 farms).

20. Mr. Randy Mooney is Chairman of the Board of Dairy Farmers of America. Mr. Mooney is also Chairman of the Board of National Milk Producers Federation.

21. DFA's Chief Executive Officer, Chief Financial Officer, Senior Vice President of Fluid Milk Marketing, Senior Vice President of Government, Industry, and Public Relations, and 13 DFA board members hold 18 of the 36 seats on the NMPF Board of Directors. By comparison, runner-up California Dairies holds 5 board seats.

22. By all measures, those who manage DFA control much of the U.S. dairy industry.

## HISTORICAL DEVELOPMENT OF THE ENTERPRISE

23. Despite its statutory requirement as an agricultural cooperative to operate solely for the benefit of its members, DFA's leadership began milk processing activities soon after the cooperative's formation. These activities incentivized the cooperative to offer a lower price to farmers for their milk so that management could generate higher profits by marketing finished products.

24. In relation to these activities, DFA suffered a judgment for misreporting its members' milk quality at processing facilities in Wisconsin.

25. Aside from symbolic and discretionary "equity" payments of several cents per hundredweight of milk shipped by each member, processing and other profits are never returned and have never been returned to the farmer members.

26. DFA's leadership went on to obtain a stake in Southern Foods Group, then the third largest milk processor in the country. In 2000, Southern Foods Group merged with Suiza Foods, the nation's largest milk processor, and the DFA stake in Southern Foods Group became an interest in Suiza. In 2001, Suiza merged with Dean Foods, the nation's second largest dairy processor. Suiza was renamed "Dean Foods," and DFA traded its Suiza stake through the merger for a 33.8% interest in the new Dean Foods (hereafter "Dean Foods" or "Dean" inclusive of all affiliates, subsidiaries, and related entities).

27. In December 2001, DFA's leadership traded this interest to Dean in exchange for a $40 million note. This note would accrue interest at an undisclosed rate up to a total of $96 million, but would expire in 2021 with no obligation to pay any portion of the principal or interest – provided that Dean did not terminate or materially breach its

milk supply agreements with DFA prior to that date. Those agreements required Dean to purchase the bulk of its milk requirements from DFA at DFA's price.

28. DFA's leadership used its exclusivity rights to Dean's nationwide network of processing plants to initiate mergers with these plants' other supplier cooperatives, both in the name of "efficiency" and via illegal sole-supply agreements which created local monopolies in favor of DFA. This approach rapidly expanded DFA management's control as small local cooperatives joined DFA in order to maintain access to their local processing plants.

29. DFA's sales personnel used predatory pricing to eliminate competition from smaller cooperatives and secure control of milk plants in Midwestern states.

30. In 1999, DFA's leaders joined with Northeast cooperatives Dairylea and St. Albans to create Dairy Marketing Services (DMS), a nationwide marketing entity.

31. DFA's leaders also created and directed Dairy America, another nationwide marketing agency formed with California Dairies and other cooperatives. From 2002 to 2006, Dairy America marketed 75% of U.S. nonfat dry milk powder and misreported prices to the USDA such that approximately $600 million was diverted from farmer milk prices to cooperative profits.

32. During the mid-2000s under DFA's new CEO Rick Smith, a lawyer from Brooklyn, New York, DFA's managers used DMS to take sole-supply agreements to a new level. DFA managers presented smaller local cooperatives with the choice of using a single entity (DMS) to handle trucking, testing, processing, and marketing their members' milk – or of trying to compete with DFA and DMS for access to processing facilities.

33. By 2011, access to processing facilities in the Eastern United States outside DMS was nonexistent for most small cooperatives. When Dean Foods agreed to purchase a

portion of its Northeast milk from non-DFA/DMS sources as part of an antitrust settlement in Vermont, DFA's CEO Rick Smith and DFA's attorneys personally coerced the plaintiffs' attorneys into dropping that part of Dean Foods' settlement.

34. In 2014, DFA's leadership merged the cooperative with Dairylea, one of the Northeast's oldest cooperatives. Dairylea owned DairyOne, LLC, the Northeastern United States' leading milk testing lab. Since dairy farmers are paid based on their milk quality test results, DFA's leadership now had a new means of managing the cooperative's profit – one which was used to punish several farmers who spoke up with concerns.

35. In 2019, DFA's leadership merged the members of Vermont's St. Albans Cooperative Creamery into DFA - along with Vermont's historical star creamery operation.

36. Through a history of milk test tampering, arbitrary use of farm milk inspections, and manipulation of access to local milk processors, DFA's leadership instilled fear into farmers industrywide, including members of "independent" cooperatives which marketed their milk through DMS. This conduct secured silence, compliance, and continued milk supply at below-market prices from farmers.

37. DFA leaders' ability to instill fear was furthered by their control of National Milk Producers Federation. NMPF administers the National Dairy "Farmers Assuring Responsible Management" (FARM) Program, under which cooperative leadership provides for on-farm inspections relating to areas including animal care and veterinary retention practices, employment and workforce development, and environmental impact.

38. Of the U.S. milk supply, 98% is subject to the FARM inspection program.

39. For DFA member farms and member farms of cooperatives which market their milk through DFA, the FARM inspectors are DFA employees.

40. FARM standards are both voluminous and continuously evolving. Substantially all U.S. dairy farms are out of compliance with one or more FARM standards.

41. If producers do not maintain FARM compliance, they can be barred (if the standards are enforced) from selling their milk regardless of whether they are DFA members or members of other cooperatives. DFA's managers enforce FARM standards and inspections arbitrarily as a means of instilling fear in dissidents and solidifying its comprehensive control over the industry.

### FIRST PREDICATE ACTS OF EXTORTION:

### OBTAINING FARMERS' CONSENT TO SETTLE ANTITRUST CLAIMS

42. In June 2014, DFA was facing a jury trial in Vermont on antitrust grounds. DFA's attempt to settle the case was struck down by the court after a number of dairy farmers voiced objection via letter and at the court's Fairness Hearing. A second proposed settlement fared no better.

43. When DFA's leaders arranged a third settlement in 2016, they resorted to extortion to ensure that the dairy farmers would fall squarely on their side of the courtroom. Specifically, DFA's managers sent their FARM inspectors and routine milk inspectors to farms with an offer – sign in support of the settlement or lose your milk market.

44. DFA inspectors and other employees pressured dairy farmers with threats including that, if these dairy farmers did not sign in support of DFA's settlement, they should consider switching to organic milk production, they should start looking for new

processing plants, they could be dismissed from their cooperatives, and their cooperatives could lose access to DMS-controlled milk markets.

45. Over 1,200 farmers from DFA, St. Albans, Dairylea, small regional cooperatives which marketed their milk through DMS, and even "independent" dairy farmers selling through DMS to Kraft Heinz Company signed DFA's form letters, and the suit against DFA was settled and closed.

## SECOND PREDICATE ACTS OF EXTORTION:

## OBTAINING A CONTROLLING SHARE OF THE NATIONAL MILK SUPPLY

46. Emboldened by the settlement of the Northeast and earlier Southeast antitrust actions, DFA's leadership used their control over milk markets nationally to make it impossible for a mid-sized plant to find milk outside of DFA/DMS, or for an individual farmer or small cooperative to get their milk to such a plant. The DFA/DMS bloc was highly effective at merging small cooperatives into DFA, and in 2017 DMS ceased operations.

47. DFA's managers gave independent farmers and cooperatives who had shipped through DMS a choice – market your milk through DFA and agree to a "market adjustment" deduction from your farmers' pay price, or lose market access.

48. For one Midwest cooperative, this market adjustment was over 25% of its farmers' $16 per-hundredweight milk price. A Northeast farm had to choose between losing $2.50 of its $12 per-hundredweight price or having no market access for its milk.

49. By comparison, the U.S. Department of Agriculture's Economic Research Service estimated the 2018 milk per-hundredweight cost of production at $21.74, including land, equipment, and labor put in by unpaid owner/operator farmers.

50. DFA managers also used their cooperative's position as the primary supplier of certain regional dairy processors to dictate the terms on which these processors could accept milk from smaller cooperatives or individual farmers. Thus, without exercising direct ownership, DFA's managers controlled substantially the entire milk market.

51. One Kentucky dairy farm switched milk buyers three times in an attempt to survive financially by staying out of DFA's control. A New York farm switched cooperatives twice for the same reason. When the DFA cartel absorbed their new cooperatives leaving them unable to switch again, both families had no choice but to liquidate during depressed market conditions, losing thousands of dollars in dairy herd value and watching many of their milking cows leave directly for slaughterhouses.

52. After DFA's absorption of Vermont's St. Albans cooperative in November 2019, Agri-Mark and its 850 members became the only significant alternative cooperative in the Northeast. Agri-Mark was and is forbidden from taking on members from DFA without DFA's express permission.

53. Using this control, DFA's managers were able to charge milk buyers over-market prices for milk products while paying farmers less than the cost-of-production. DFA's managers were able to continue doing so because substantially all new entrants were and are barred from the marketplace: prospective dairy farmers have no viable option to sell milk besides DFA, and prospective milk processors likewise have no other viable option to buy milk.

54. Numerous dairy farmers, regardless of whether they are members of DFA or members of smaller "independent" cooperatives, were and are afraid to raise any concern regarding any of this conduct for fear of DFA reaching through their

cooperative and terminating their milk market. Since DFA's managers had already eliminated other milk marketing options, these farmers had no choice but to silently accept milk prices and comply with demands which a decade ago they would have scoffed at.

55. A limited number of farmers were able to obtain better milk prices by selling milk directly to Dean Foods Company. One Dean Direct farmer compared notes with his DFA neighbors and found that Dean Foods was paying substantially more for his milk than DFA was paying its members for theirs.

**THIRD PREDICATE ACTS OF EXTORTION:**

**CONTROLLING THE NATION'S LARGEST DAIRY PROCESSING NETWORK**

56. Using its all-but-complete control over the national USDA Grade A raw milk supply, DFA's management presented Dean Foods, now the nation's largest dairy processor and direct-to-store distributor, with a demand of its own – pay DFA over-market prices in order to maintain access to its milk, which constituted over 60% of Dean Foods' milk utilization. Dean Foods was bound by its market share agreement of 2001 and at any rate had no prospect of obtaining such milk volume elsewhere.

57. By late 2019, with cost of sales rising over 80% (while on-farm milk prices struggled well below cost-of-production), Dean Foods was facing a liquidity crisis.

58. On November 12th, 2019, Dean Foods filed for chapter 11 bankruptcy[1], listing DFA as by far its largest trade creditor. DFA was owed $173 million; Land O' Lakes (the runner-up dairy cooperative creditor) was owed $8 million.

---

[1] Dean Foods and its related entities who collectively filed for bankruptcy (consolidated into a single action) were: Southern Foods Group, LLC; Dean Foods Company; Alta-Dena Certified Dairy, LLC; Berkeley Farms, LLC; Cascade Equity Realty, LLC; Country Fresh, LLC; Dairy Information Systems Holdings, LLC; Dairy Information Systems, LLC; Dean Dairy Holdings, LLC; Dean East II, LLC; Dean East, LLC; Dean Foods North Central, LLC; Dean Foods of Wisconsin, LLC; Dean Holding Company;

59. During the period of events directly leading to the Dean Foods bankruptcy filing, DFA was at substantially all times Dean Foods' primary supplier of USDA Grade A raw milk. During such period, the amounts paid for USDA Grade A raw milk were at substantially all times Dean Foods' primary input cost.

60. During such period, the prices which DFA charged Dean Foods for its milk were consistently over-market relative to the prices charged by Dean Foods' other smaller milk suppliers.

61. During such period, Dean's cost of sales rose continually both in dollar terms and as a percent of sales. This continual increase occurred regardless of fluctuations in the on-farm milk price which DFA paid farmers for the milk.

62. During this time, DFA's leadership was aware that its milk charges were causing a liquidity crisis for Dean Foods.

63. When Dean announced its bankruptcy filing, it also announced that it was in advanced discussions with DFA to transfer substantially all of its assets.

64. Gary Rahlfs' experience included serving on PepsiCo's senior management in 2015 when PepsiCo turned over a $206 million plant in Batavia, NY to DFA for thirty cents on the dollar following the bankruptcy of a PepsiCo dairy processing joint venture with Quaker Muller. In May 2019, Gary Rahlfs became Dean Foods' SVP,

---

Dean Intellectual Property Services II, Inc.; Dean International Holding Company; Dean Management, LLC; Dean Puerto Rico Holdings, LLC; Dean Services, LLC; Dean Transportation, Inc.; Dean West II, LLC; Dean West, LLC; DFC Aviation Services, LLC; DFC Energy Partners, LLC; DFC Ventures, LLC; DGI Ventures, Inc.; DIPS Limited Partner II; Franklin Holdings, Inc.; Fresh Dairy Delivery, LLC; Friendly's Ice Cream Holdings Corp.; Friendly's Manufacturing and Retail, LLC; Garelick Farms, LLC; Mayfield Dairy Farms, LLC; Midwest Ice Cream Company, LLC; Model Dairy, LLC; Reiter Dairy, LLC; Sampson Ventures, LLC; Shenandoah's Pride, LLC; Steve's Ice Cream, LLC; Suiza Dairy Group, LLC; Tuscan/Lehigh Dairies, Inc.; Uncle Matt's Organic, Inc.; and Verifine Dairy Products of Sheboygan, LLC.

Finance and Strategy. In September 2019, Rahlfs became Dean's CFO, a position he held for the duration of the bankruptcy and sale to DFA.

65. Despite the availability of financing for an out-of-court restructuring prior to the bankruptcy filing, Dean expressed no real interest in restructuring to avoid bankruptcy. While publicly stating concerns over liquidity issues and potential loss of milk supply for its customers, Dean chose the bankruptcy to transfer the assets to DFA free and clear of claims on an expedited schedule.

66. Dean Foods had no alternative source for the volume of milk which DFA provided during the period. Even had Dean located an alternative source for the volume of milk which DFA provided during such period, Dean could not materially breach or terminate its milk supply agreement with DFA without incurring a $96 million penalty. Had Dean continued operating into 2021, the penalty would have expired without any obligation to pay any portion of the principal or interest.

## INJURY AND DAMAGES

67. DFA's takeover of substantially all of Dean Foods' assets left Dean Foods' bankruptcy estate administratively insolvent and its shareholders (including Plaintiff Susan L. Poole), bondholders, and unsecured creditors (including certain Plaintiff Dairy Farmers who had sold milk to Dean prior to and during the bankruptcy) with hundreds of millions in losses.

68. DFA was financially able to undertake this purchase due to income and assets obtained through extortion of milk income from dairy farmers including Plaintiff Dairy Farmers.

**ONGOING EXTORTION**

69. In a mere two decades, DFA's leadership extorted their way to control as both the exclusive market for dairy farmers' raw milk and the exclusive source of finished dairy products for retail in numerous areas of the country – taking their current level of control at the worst possible time for both dairy farmers and retail consumers due to the coronavirus pandemic.

70. At our current moment of greatest need for locally available foods, DFA's milk cartel transports dairy products greater distances and charges higher prices than at any time in our nation's history – while dairy farmers are forced into insolvency and liquidation in record numbers.

71. During this unfolding disaster, NMPF with the DFA leadership at its helm issued a proposal on April 6, 2020 that the USDA provide loans, loan forgiveness, and direct purchases to subsidize milk production and sale. Through fear of industry collapse and consumer shortages, Defendants sought and secured taxpayer subsidy for their unlawful course of conduct.

72. In contrast, dissolution of the DFA enterprise and divestiture of the assets it now holds are the remedies prescribed by law. These remedies offer a fresh start for the critical economic and food supply infrastructure destroyed by the milk cartel.

73. Following Defendants' conduct and the lack of legal enforcement, the unfortunate chain of events which our dairy supply chain is now suffering was as predictable as it is regrettable. To render these events mere lessons of history, rather than a new state of affairs, judgment must be executed on Plaintiffs' behalf. Should such judgment fail, the rest of the nation waits next in line to suffer Defendants' extortion via the U.S. Treasury and the supermarket dairy cooler.

## JURY DEMAND

Wherefore, Plaintiffs demand a trial by jury pursuant to Fed. R. Civ. Pro. 38(b) on all questions so triable.

## PRAYER OF RELIEF

Wherefore, Plaintiffs demand judgment as follows.

1. Declare Defendants liable for damages for racketeering pursuant to 18 U.S.C. 1964.

2. Order the receivership and subsequent divestiture of all processing operations or interests owned or controlled by Dairy Farmers of America, Inc. or its predecessors, successors, subsidiaries, affiliates, and insiders including any and all past and present officers, directors, agents, and controlling persons of such entities.

3. Order Dairy Farmers of America, Inc. subsequently dissolved, with any equity returned to its member farms, and said member farms released from any and all obligation to DFA or its predecessors, successors, subsidiaries, affiliates, parties to contract, insurers, members, owners, attorneys, and any and all past and present officers, directors, employees, agents, and controlling persons of such entities.

4. Award damages, costs, and attorneys' fees against all Defendants jointly and severally, to Plaintiffs respectively and to the maximum extent permitted by law.

5. Award such further relief as the Court shall deem just and proper.


Dated: West Edmeston, New York            */s/ Joshua D. Haar*
      June 22, 2020                                 Law Offices of Joshua D. Haar, Esq.
                                            1495 Paddock Road
                                            West Edmeston, NY 13485
                                            Tel. 315-825-8106
                                            jhaar@fdwcpa.net
                                            *Counsel for the Plaintiffs*